UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CHARLES L. GARNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:14-cv-01392 |
| v. ) | Judge Aleta A. Trauger |
| ) | |
| SDH SERVICES EAST, LLC., *et al.*, ) | |
| ) | |
| Defendants, ) | |

**MEMORANDUM**

After the plaintiff filed this action in Tennessee state court, the defendants removed the case to this court, notwithstanding a lack of complete diversity. Defendant Mark Patton has filed a Motion to Dismiss (Docket No. 5), to which the plaintiff has filed a Response in opposition (Docket No. 9), and Patton filed a Reply (Docket No. 16). The plaintiff has filed a Motion to Remand (Docket No. 11), to which the defendants have filed a Response in opposition (Docket No. 17), the plaintiff filed a Reply (Docket No. 19), and the defendants filed a Sur-Reply (Docket No. 22). For the reasons stated herein, the Motion to Remand will be denied and the Motion to Dismiss will be granted.

**BACKGROUND**

**I.     Complaint Allegations**

Cumberland University is a private university located in Lebanon, Tennessee. The plaintiff, Charles Garner, worked as a painter at the University from September 1, 1998 until his termination on May 24, 2013. He worked directly for the University for the first nine years of this time frame, at which point the University outsourced its painting services to a private

1

company, Sodexo. Garner worked for Sodexo until his termination.[1] None of the Sodexo entities is a Tennessee resident.

Garner suffers from severe and debilitating mental impairments, learning disabilities, and illiteracy. Notwithstanding these disabilities, Garner performed the essential functions of his job as a painter, became a valuable employee, and never had disciplinary actions taken against him prior to the incidents at issue in this lawsuit. Garner alleges that he is substantially impaired in the major life activities of learning and cognitive thinking, including reading and writing.

Mark Patton, a resident of Lebanon, Tennessee, was Sodexo's General Manager at the University during the relevant time frame. During the time period in which Patton supervised Garner, Patton allegedly began to single out Garner for hostile and discriminatory treatment. Patton began assigning Garner tasks that were outside of his job as a painter, with the knowledge that Garner did not know how to perform these tasks and would not be able to learn how to perform them. Patton yelled at Garner because of his mental impairment, his inability to learn, and his illiteracy. In front of other people, Patton ridiculed Garner and informed people (in Garner's presence) that Garner could not read or write.

---

[1] There are apparently several companies within the "Sodexo" corporate family. The defendants contend that only one of these entities is a proper defendant, although they do not argue that the issue impacts the pending motions. For purposes of linguistic simplicity only, the court will refer to these defendants collectively as "Sodexo" herein. The operative point is that no Sodexo entity is a "resident" of Tennessee.

On a related note, based on the limited information in the record at this stage, it appears that Garner's counsel has named a host of Sodexo entities as defendants only out of an abundance of precaution. Perhaps the parties will be able to confer and identify the appropriate corporate employer defendant (and dismiss the remaining defendants) without controversy. If the parties cannot reach agreement on this issue before the forthcoming initial case management conference, they should be prepared to explain why the issue cannot be resolved without further proceedings.

In approximately summer 2012, Garner reported Patton's actions to University officials and filed an internal disability discrimination complaint with Sodexo. Following these complaints, Patton allegedly increased his hostility towards Garner. Patton wrote up Garner for pretextual reasons and punished Garner using unreasonable measures. For example, Sodexo typically provided a company vehicle to employees to travel across campus. On a certain day following Garner's complaints about Patton, Patton removed Garner's vehicle from him based on an unspecified earlier write-up, forcing Garner to walk outside all day during the middle of the summer to perform his job.[2] Patton also continued to ask Garner to perform non-painting tasks that Patton knew Garner could not perform. For example, Patton assigned Garner to perform electrical work, despite knowing that Garner would not be able to do it correctly. When Garner protested that he was only qualified to paint, Patton told him: "just don't blow anything up." Garner also continued to yell at Garner for various reasons.

On May 24, 2013, Patton fired Garner under allegedly false pretenses. At some point several weeks prior to that date, Patton asked Garner to clean out an area around a fence at the University, where trash and some type of scrap materials had been deposited. Specifically, Patton asked Garner to make the trash and scrap "disappear." Garner in fact cleaned out the area and found three metal fittings among the deposited materials. Initially, Garner left the metal fittings at the site. After several weeks, Garner picked up the metal pieces and placed them in his truck, as he claims he had done in the past without his employer indicating that it was a problem. In fact, Patton saw the fittings in Garner's truck but did not initially say anything to Garner about

---

[2] The Complaint is not precise as to what transpired, but the Complaint gives rise to a reasonable inference that Patton used an earlier write-up of Garner as a pretext to remove Garner's vehicle at some point well after the fact.

it. After several days, Patton asked Garner about the materials. Thereafter, Sodexo discharged Garner for violating a company policy that prohibits the "unauthorized removal of company or client property or materials, including those that have been or [were] agreed to be discarded." Garner alleges that, in the past, Sodexo had never told Garner that his conduct presented an issue, suggesting that Garner was singled out for special treatment with respect to the purported grounds for his termination.

Garner allegedly had an emotional breakdown because of treatment at Sodexo. On each workday before his termination, Garner was afraid of what would happen to him at the job that day. Initially, Garner was unable to sleep, cried at night, and had severe anxiety. He eventually had to see a doctor for his problems and now takes prescription medication to treat these issues. He alleges that his symptoms became even worse when Sodexo terminated him on May 24, 2013.

## II. **Procedural History**

On May 23, 2014, the plaintiff filed a Complaint against the defendants in Tennessee state court. The Complaint asserts claims against all defendants (including Patton, an individual) for (1) discrimination, hostile work environment, and retaliation under the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103 (Counts 1, 2, and 3, respectively), (2) retaliatory discharge in violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 (Count 4), (3) retaliatory discharge in violation of Tennessee common law (Count 5), and (4) intention infliction of emotional distress under Tennessee common law ("IIED") (Count 6). The Complaint also asserts negligence-based claims against specific Sodexo entities (Counts 7 and 8), neither of which is at issue in the Motion to Remand.

Patton is a resident of Tennessee and is the only non-diverse defendant. On June 27, 2014, the defendants removed the case to this court, contending that Garner had fraudulently joined Patton in an effort to defeat diversity. (Docket No. 1.) Garner has filed a Motion to Remand, contending that there is a colorable argument that he can maintain at least one of his claims against Patton. In response, the defendants contend that (1) Tennessee law forecloses any individual claims against Patton as to Counts 1 to 5, and (2) Garner's allegations are plainly insufficient to state an actionable IIED claim.[3] Asserting substantially the same arguments as the defendants assert in opposition to Garner's Motion to Remand, Patton has also filed a Motion to Dismiss, which Garner opposes.

## **FRAUDULENT JOINDER STANDARD**

Subject to exceptions not relevant here, federal diversity jurisdiction exists "only when no plaintiff and no defendant are citizens of the same state." *Jerome-Duncan, Inc. v. Auto-By-Tel., L.L.C.*, 176 F.3d 904 (6th Cir. 1999). Thus, in order for a defendant to remove a case to federal court under 28 U.S.C. § 1441 based on diversity jurisdiction, there must be complete diversity of citizenship both at the time the case is commenced and at the time that the notice of removal is filed. *Id.* If a federal court determines that it lacks subject matter jurisdiction, it must remand the case. *See* 28 U.S.C. § 1447(c).

Fraudulent joinder is a judicially created doctrine that provides a limited exception to the requirement of complete diversity. *Collins v. Bacon*, 2005 WL 2429844, at *2 (E.D. Tenn. Sept. 30, 2005) (citing *Triggs v. John Crump Toyota, Inc.*, 154 F.2d 1284, 1287 (11th Cir. 1998)).

---

[3] In his Reply on the Motion to Remand, Garner argues that the court should ignore the defendants' opposition brief as untimely. As the defendants argue in their Sur-Reply, Garner's argument is demonstrably wrong: the defendants' brief was timely under the applicable procedural rules. Even if it were not, Garner suffered no prejudice.

Under the doctrine of fraudulent joinder, the citizenship of a defendant who has been fraudulently joined should be disregarded when determining whether a federal court has diversity jurisdiction. *See Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999). Thus, where a defendant removes a case despite the existence of a non-diverse party, the removing defendant may avoid remand by demonstrating that the non-diverse party was fraudulently joined. *Id.*[4]

Under the doctrine of fraudulent joinder, the relevant inquiry is whether the plaintiff had "at least a colorable cause of action" under state law against the non-diverse defendant. *Jerome Duncan*, 176 F.3d at 907. Accordingly, this court must look to Tennessee law to determine whether Patton is a proper defendant or, in the alternative, whether he was fraudulently joined. *See id.* The non-moving party's actual motive for joining a non-diverse party is immaterial to the court's determination regarding fraudulent joinder. *Id.* The burden of proving fraudulent joinder is on the removing party or parties – here, the defendants. *Id.*

"There can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged or on the facts in view of the law . . . . One or the other at least would be required before it could be said that there was no real intention to get a joint judgment, and that there was no colorable ground for so claiming." *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 949 (6th Cir. 1994) (quoting *Bobby Jones Garden Apartments, Inc. v. Suleski*, 391 F.2d 172, 176 (5th Cir. 1968)); *accord Walker v. Phillip Morris, U.S.A.*, 443 F. App'x 946, 951 (6th Cir. 2011). "Therefore, the question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved." *Alexander*, 13 F.3d at 949. Stated another way, the question is whether there is any reasonable

---

[4] Under 28 U.S.C. § 1441(b), a defendant may remove a case to federal court based upon diversity jurisdiction "if none of the parties in interest *properly joined* and served as defendants is a citizen of the State in which such action is brought." (emphasis added).

basis for predicting that the plaintiff could prevail. *Id.* In making its determination, any disputed questions of fact and ambiguities in the controlling state law must be resolved in favor of the nonremoving party. *Id.*; *accord Coyne*, 183 F.3d at 493. All doubts as to the propriety of removal are resolved in favor of remand. *Id.* However, the Sixth Circuit has indicated that, in the absence of directly applicable state court precedent, a district court may look to analogous state laws in construing the validity of a claim under the law at issue. *See generally Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428 (6th Cir. 2012).

As at least some district courts within this circuit have observed, applying the fraudulent joinder standard can be a difficult inquiry, because the Sixth Circuit's "reasonable basis" and "colorable cause of action" standard leaves room for debate as to how deferential a court should be in evaluating the sufficiency of the plaintiff's claims for fraudulent joinder purposes, short of applying the Rule 12(b)(6) standard. *See Little v. Purdue Pharma, L.P.*, 227 F. Supp. 838, 845-46 (S.D. Ohio 2002). At a minimum, it places the court in the position of attempting to evaluate whether there is a "colorable" cause of action under state law before exercising jurisdiction (assuming that the non-diverse defendant was fraudulently joined) to reach the merits of the state law claims.

To add another layer of complexity, it does not appear that the Sixth Circuit has explicitly stated whether district courts assessing fraudulent joinder should consider the claims in light of the pleading standard applicable in state court rather than the federal pleading standards (if they differ). Here, the distinction is important, because Tennessee has rejected the *Twombly/Iqbal* standard for analyzing motions to dismiss. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422 (Tenn. 2011). Instead of the more stringent federal standard, Tennessee employs a "liberal notice pleading standard," the primary purpose of which is merely "to provide

notice of the issues presented to the opposing party and the court." *Id.* at 426.[5] Reasoning that a federal district court's role is to determine whether there is "arguably a reasonable basis for predicting that the state law might impose liability on the facts involved," many federal courts have applied the state law standard in determining fraudulent joinder. *See Smith v. Baker Concrete Constr., Inc.*, 2014 WL 3715125, at *4 (E.D. Tenn. Mar. 28, 2014) (applying Tennessee pleading standard); *Worrix v. Medtronic, Inc.*, 2013 WL 6834719, at *4 (E.D. Ky. Dec. 23, 2013) (applying Kentucky pleading standard); *In re Regions Morgan Keegan Secs., Derivative, & ERISA Litig.*, 2013 WL 2404063, at *12-*13 (W.D. Tenn. May 31, 2012) (concluding, after conducting an *Erie* analysis, that more liberal Texas pleading standard should apply). By contrast, other federal courts, applying the rule that the federal rules "apply to a civil action after it is removed from a state court," *see* Fed. R. Civ. P. 81(c)(1), have found that the federal pleading standards apply when assessing fraudulent joinder. *See, e.g.*, *Beavers v. DePuy Ortho., Inc.*, 2012 WL 1945603, at *3 (N.D. Ohio May 30, 2012); *Okenpu v. Allstate Tex. Lloyd's*, 2012 WL 1038678, at *7 (S.D. Tex. Mar. 27, 2012).

Here, the defendants do not appear to dispute that the court should consider the claims against Patton in light of the more liberal Tennessee standard. (*See* Docket No. 17 at p. 13 n.4.) Moreover, as explained herein, Garner's claims against Patton are insufficient even under

---

[5] In *Webb*, the Tennessee Supreme Court was critical of the United States Supreme Court decisions in *Twombly* and *Iqbal*. *See Webb*, 346 S.W.3d at 432. Among other criticisms, the court declared that the "the *Twombly/Iqbal* standard is at odds with the well-established principle in Tennessee that a Rule 12.02(6) motion [Tennessee's Rule 12 equivalent] challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. It also conflicts with the strong preference embodied in the Tennessee Rules of Civil Procedure that cases stating a valid legal claim brought by Tennessee citizens be decided on their merits." *Id.*

8

Tennessee's standard. Therefore, the court will apply the Tennessee procedural standard here, although its decision to do so is limited to the specific context of this case.[6]

## ANALYSIS

**A. Retaliation Claims under the TPPA and Tennessee Common Law**

Garner's retaliation claims against Patton under the TPPA and Tennessee common law are not colorable. The thrust of Garner's Complaint is that Patton, in his role as a supervisor for Sodexo, targeted Garner for discriminatory treatment and retaliatory treatment. Courts have uniformly held that individual supervisors cannot be named as defendants under the TPPA or under Tennessee common law. The TPPA authorizes lawsuits against "private employers," not individuals. *See Baines v. Wilson Cnty.*, 86 S.W.3d 575, 583 (Tenn. Ct .App. 2002); *Smith v. Harriman Util. Bd.*, 26 S.W.3d 879, 885 (Tenn. Ct. App. 2000); *see also Wooley v. Madison Cnty., Tenn.*, 209 F. Supp. 2d 836, 845 (W.D. Tenn. 2002); *Cate v. City of Rockwood*, 2006 WL 1129382, at *6-*7 (E.D. Tenn. Apr. 27, 2006). Similarly, supervisors cannot be held liable for common law retaliation. *See Baines*, 86 S.W.3d at 583; *see also Brown v. Delek U.S. Holdings, Inc.*, 2009 WL 4884442, at * (M.D. Tenn. Dec. 10, 2009); *Rhea v. Dollar Tree Stores, Inc.*, 2005 WL 2600213, at *8 (W.D. Tenn. Oct. 12, 2005).

---

[6] In *In re Regions*, the district court determined that claims against a non-diverse defendant would not satisfy the federal Rule 12 standard but would survive Texas's liberal pleading standard. 2013 WL 2404063, at *11. The court conducted an analysis inspired by the *Erie* doctrine (as articulated in *Miller v. Davis*, 507 F.2d 308 (6th Cir. 1974)) and concluded that the balance of relevant factors favored the application of the Texas pleading standard, rather than the federal pleading standard. 2013 WL 2404063, at *11-*13. Here, the parties have not engaged in any in-depth analysis of this issue, in light of *Erie* or otherwise. Furthermore, Sodexo and Patton have not directly disputed Garner's contention that the court should construe his allegations in light of Tennessee's more liberal pleading standard. Thus, the court expresses no opinion as to how it would rule if a party were to argue the issue in light of *Erie*.

9

## B. TDA Claims

Garner's claims against Patton under the TDA may only proceed if there is a "colorable" argument that the TDA permits lawsuits against individual supervisors. Under the TDA, "there shall be no discrimination in the hiring, firing and other terms and conditions of employment of the state of Tennessee or any department, agency, institution, or political subdivision of the state, or of any private employer, against any applicant for employment based solely upon any physical, mental, or visual disability of the applicant . . . ." Tenn. Code Ann. § 8-50-103(b). Notably, the list of actors who may be found to have engaged in a discriminatory practice does not include individuals.

The TDA states that, upon receipt of a discrimination complaint by an aggrieved individual, the Tennessee Human Rights Commission ("THRC") must "follow the procedure and exercise the powers and duties provided in §§ 4-21-302 – 4-21-311, and the person shall have all rights provided therein." The TDA's cross reference is to <u>certain provisions</u> of the Tennessee Human Rights Act ("THRA"), § 4-2-101 *et seq.* Under the unambiguous language of the statute, the THRA incorporates by reference only §§ 4-21-302 through 4-21-312 of the THRA, not the other provisions in the statute (of which there are many).

Section 4-21-301 of the THRA is the only part of the THRA that authorizes suits against individuals in specific instances. The version of § 4-21-301 in effect through June 30, 2014 provided that it was a "discriminatory practice" for a "person" to engage in one of five enumerated categories of conduct, only two of which are relevant here: (1) retaliating or discriminating in any manner against a person because that person opposed a discriminatory practice under the THRA or otherwise participated in an investigation of a potential THRA violation; and (2) aiding, abetting, inciting, compelling, or commanding a person to engage in a

violation of the THRA (collectively, "aiding or abetting" a THRA violation). *See id.* at § 4-21-301(1) and (2) (version effective through June 30, 2014).[7] Here, Garner argues that he may pursue individual claims against Patton (for aiding and abetting discrimination and for retaliation) based on this provision of the THRA. By the plain terms of the TDA, which does not incorporate § 4-21-301, there is no legitimate basis for this argument.

In *Satterfield v. Bluhm*, 2004 WL 833291, at *3-*4 (Tenn. Ct. App. Apr. 16, 2014), the Tennessee Court of Appeals squarely addressed this issue and held that the TDA, by its own terms, did not incorporate § 301 and the associated "aiding and abetting" basis for individual liability. Garner does not offer any competing plausible interpretation of the statute – nor could there be one. Instead, he relies on a generic statement in *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000), in which Tennessee Supreme Court stated that the Tennessee Handicap Act (later renamed the TDA) "embodies the definitions and remedies provided by the [THRA]." *Id.* The case concerned the plaintiff's claim against his employer (not an individual) for disability discrimination but involved no question related to the incorporation (or lack thereof) of Tenn. Code Ann. § 4-21-301 into the TDA. In discussing the relevant legal standards for a traditional disability discrimination claim under the TDA, the *Barnes* court stated that the TDA incorporated definitions and remedies under the THRA, which itself was intended to be

---

[7] The Tennessee General Assembly recently amended the THRA, which amendments are effective July 1, 2014 and are applicable to "all actions accruing on or after the effective date of this act." *See* 2014 Tenn. Laws Pub. Ch. 995, TN LEGIS 995, §§ 7 and 8. In most relevant part, the new version of § 301 <u>removes</u> the "aiding or abetting" basis for individual liability under the THRA. Here, Garner's cause of action accrued well before the effective date of this amended version of the statute; thus, only the previous version of the THRA, which includes an aiding or abetting provision, applies to Garner's claims in this case. However, for THRA causes of action that accrue after July 1, 2014, future plaintiffs appear to be precluded from pursuing individuals for aiding or abetting a THRA violation.

construed in light of federal civil rights laws. *Barnes*, 48 S.W.3d at 705. The court was simply attempting to explain why it could "look to federal law for guidance in enforcing our own anti-discrimination laws" in the context of evaluating the TDA claims at issue in the case. *Id.* The court was not purporting to rule that the TDA had, without exception, incorporated the THRA wholesale.

In *Satterfield*, which actually involved the issue of whether § 301 of the THRA had been incorporated into the TDA, the court distinguished the Tennessee Supreme Court's general statement in *Barnes*, which cannot be read as directing courts to ignore the plain language of the TDA on questions not at issue in *Barnes*. This court agrees with *Satterfield*'s reasoning.

Although the *Satterfield* opinion is unpublished, it is appropriate for federal courts to look to on-point state appellate court cases as persuasive authority, regardless of whether those cases are published. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2011). More importantly, because *Satterfield* is directly on point and its logic is unassailable, the court finds it to be persuasive on the issue presented here. Indeed, another judge within this district has reached the same conclusion concerning the scope of the TDA, based on both that court's independent reading of the TDA and the Tennessee Court of Appeals' reasoning in *Satterfield*. *Powell v. Winn*, 2010 WL 2036212, at *2-*3 (M.D. Tenn. May 20, 2010).

Also, as the defendants point out, Tennessee courts have construed analogous language in the TPPA in the same manner as *Satterfield* and *Powell*. Similar to the TDA, the TPPA specifies that it applies only to "[t]he state or municipality, county, department, board, commission, agency, instrumentality, political subdivision or any other entity of the state" or a "private employer." Tenn. Code Ann. § 5-1-304(a)(2). Tennessee courts have uniformly held that this language does not authorize lawsuits against individuals, who are not among the enumerated

12

entities subject to suit. *See, e.g.*, *Baines*, 86 S.W.3d at 582; *Smith*, 26 S.W.3d at 885; *see also Wooley*, 209 F. Supp. 2d at 845. As the Sixth Circuit did in *Casias* relative to Michigan law in the context of assessing fraudulent joinder, it is appropriate for federal district courts to look to analogous state laws in assessing the potential viability of a claim asserted under a particular statute. *Id.* at 433-34.

Because the TDA does not permit lawsuits against individual supervisors, the court concludes that there is no reasonable basis to believe that Garner could prevail on his TDA claims against Patton in Tennessee state court.[8]

### C. Intentional Infliction of Emotional Distress

The plaintiffs' IIED claim presents a slightly different issue. In contrast to the plaintiffs' other claims, which are not actionable under any circumstances, there is no statutory or caselaw authority showing that an IIED claim cannot proceed against an individual supervisor. An IIED claim requires the following elements: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618 (1997). Tennessee has adopted a "high threshold standard" for tortious conduct that is actionable as an IIED claim. *Id.*

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the

---

[8] The defendants also argue that Garner has not sufficiently pleaded the elements of an aiding an abetting theory, even under Tennessee's liberal notice pleading standard. Because Garner cannot assert a cause of action under the TDA against Patton in the first place, the court need not address this alternative argument.

> plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "outrageous."

*Id.* at 623 (quoting *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (1966)); *accord Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). The court must apply this standard to determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Bain*, 936 S.W.2d at 623. Thus, a plaintiff seeking damages for IIED must meet an exacting standard. *Arnett*, 124 S.W.3d at 540 (citing *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)). Cases in which IIED claims were viable have involved truly shocking conduct. *See, e.g., Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 140 (Tenn. Ct. App. 1975) (affirming jury verdict, where defendant had preserved the body of a premature stillborn infant in a jar of formaldehyde and displayed the jar to the mother); *Dunn v. Motor Photo, Inc.*, 828 S.W.2d 747, 751 (Tenn. Ct. App. 1991) (defendants committed "gross, inexcusable and outrageous breach of contract," where they accepted plaintiff's film for developing, told the plaintiff that her film, which included naked images of her, could not be developed, and defendants in fact developed the film and circulated the naked images to friends who desired to see a "wild picture").

In applying this standard, Tennessee courts have indicated that trial courts should be wary of permitting IIED claims to move forward in employment discrimination cases, absent exceptional allegations. *See, e.g.*, *Arnett*, 124 S.W.2d at 540 ("[D]iscriminatory conduct does not automatically give rise to the imposition of liability for intentional infliction of emotional distress. If it did, virtually every action brought under these statutes would include an intentional

infliction of emotional distress claim."); *see also Godfredson v. Hess & Clark Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) ("An employee's termination, even if based on discrimination, does not rise to the level of extreme and outrageous conduct without proof of something more. If such were not true, then every discrimination would simultaneously become a cause of action for the intentional infliction of emotional distress."). Thus, even where courts permit claims of harassment or retaliation to proceed under state and federal statutes, courts will not permit IIED claims to proceed in most employment discrimination cases; this approach applies even where a defendant or its employees engaged in highly reprehensible conduct or otherwise intended to cause the plaintiff to suffer emotional distress.[9]

Here, even evaluating the IIED claim against Patton in light of Tennessee's liberal pleading standard, the court finds that there is no reasonable basis to believe that Patton could be held individually liable for IIED under Tennessee law in light of the facts alleged. If Garner's allegations are true, Patton targeted a mentally disabled employee for discriminatory treatment, belittled the employee in front of co-workers, and retaliated against the employee for complaining about discrimination. This conduct, if proved, was reprehensible and tends to

---

[9] *See, e.g., Stacy v. MVT Servs., LLC*, 2012 WL 2281495, at *8 (M.D. Tenn. June 18, 2012) (dismissing IIED claim but permitting sexual harassment claims to proceed under Title VII, TPPA, and THRA); *Mays v. Int'l Mill Servs., Inc.*, 2006 WL 208874, at *3-*5 (W.D. Tenn. Jan. 26, 2006) ("Plaintiffs may ultimately prove that [the defendant] wrongfully discharged Randy Mays and/or that he was subjected to discrimination. However, even when the factual allegations in the plaintiffs' complaint are taken as true, those allegations fail to meet the very high standard required to establish a cause of action for outrageous conduct in Tennessee and thus fail to state a claim upon which relief may be granted."); *West v. Genuine Parts Co.*, 2011 WL 4356361, at *2 (E.D. Tenn. Sept. 16, 2011) (dismissing IIED claim associated with allegedly retaliatory termination and observing that, "[b]eing terminated from his job, even if such termination is found to be wrongful or discriminatory, does not constitute outrageous conduct for the purposes of the tort of [IIED]"); *Johnson*, 2012 WL 899325, at *8 (dismissing IIED claim and observing that the plaintiff "has provided no authority, and the court has found none, in which the Tennessee courts have recognized that an employee's termination satisfies the requisite elements for outrageous conduct").

support Garner's claims against Sodexo, perhaps convincingly. However, the Complaint does not allege conduct by Patton that even approaches the types of "outrageous" conduct required to support an IIED claim. Thus, there is no colorable basis for the IIED claim against Patton.

**D. Summary**

The court finds that the defendants have demonstrated that Garner "fraudulently" joined Patton to this lawsuit as a defendant. Accordingly, the court finds that the defendants properly removed this case, notwithstanding the lack of complete diversity at the time of removal. The court therefore has subject matter jurisdiction over this lawsuit premised on diversity of citizenship of the remaining parties.

The court's findings concerning the Motion to Remand essentially dispose of Garner's claims against Patton. Garner cannot assert claims for individual liability against Patton under the TDA or TPPA, Tennessee does not permit claims for common law retaliatory discharge against individual supervisors, and the Complaint fails to allege facts that support a viable IIED claim against Patton under the federal Rule 12(b)(6) standard (which is more stringent than the Tennessee equivalent). Accordingly, the court will dismiss the claims against Patton and the case will proceed in this court against the remaining corporate defendants.

**CONCLUSION**

For the reasons set forth herein, Garner's Motion to Remand will be denied, and Patton's Motion to Dismiss will be granted. The case will proceed against the remaining defendants, who are diverse from Garner. The court will reset the initial case management conference by separate order.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge